[Civil No. 4363.   Filed January 12, 1942.]

[120 Pac. (2d) 803.]

M. B. KUBELSKY, CECIL M. COLVIN, LILLIAN KUBELSKY and MARY M. COLVIN, Appellants, v. R. G. WINDELL, T. E. BARTLETT and J. V. NOBLE, Appellees.

435

Messrs. Wilson & Wilson, for Appellants.

Mr. Harlow H. Akers and Mr. John W. Murphy, for Appellees.

McALISTER, J.—This is an appeal by the defendants, M. B. Kubelsky, Lillian Kubelsky, Cecil M. Colvin and Mary M. Colvin, from a judgment in favor of plaintiffs, T. E. Bartlett and J. V. Noble, on a promissory note payable to T. E. Bartlett, trustee. The suit was filed in the name of R. G. Windell, but at the beginning of the trial it was stipulated that he was not a holder in due course but merely a trustee for collection and that T. E. Bartlett and J. V. Noble were the owners and holders of the note and should be substituted as plaintiffs, and from then on the action proceeded in their names. We refer to the parties as plaintiffs and defendants.

The facts out of which the action grows are substantially as stated below. James Simpson and Edith

Simpson, his wife, were the owners of about 3,000 acres of land, situated on the Gila River some miles above Arlington, Arizona, together with all the water rights therein. On December 6, 1938, they and the defendants left with the Coggins Title & Trust Company an escrow signed by them and containing these instructions: The Simpsons agree to sell "by T. E. Bartlett & Lillian G. Bartlett holder of option" and the defendants agree to buy this property for an aggregate consideration of $33,000, which the purchasers were to satisfy by paying $10,000 in cash and by delivering their note for $23,000 payable to the Simpsons and secured by a mortgage on the ranch, to be paid in installments of $3,833.33 on the first day of each January thereafter until paid, the first of these to be made on January 1, 1940, interest at five per cent. payable semi-annually. It stated also that the "Seller agrees to pay a commission of $—— to T. E. Bartlett & J. V. Noble."

Notwithstanding the escrow between the Simpsons and the defendants, Bartlett testified that he bought the property from the Simpsons late in 1938 for $29,000 and sold it soon thereafter to defendants for $33,000. There is no written evidence, other than the escrow, of the agreement between Bartlett and the Simpsons, but his testimony was that he contracted to buy it, and that after selling it to the defendants, he paid the Simpsons by giving them a part of the cash paid in by defendants on the escrow of December 6th, and by having the defendants execute their note for $23,000 in favor of the Simpsons. The title passed from the Simpsons directly to the defendants and was never in Bartlett. The escrow required the defendants to pay $10,000 in cash, but since only $6,000, in addition to the note, was necessary to make up the total of $29,000 the Simpsons were receiving for the ranch, Bartlett and the defendants seem to have made,

some days later, a different arrangement relative to the payment of the $4,000 going to Bartlett, one providing that it should be paid in this way: By defendants giving him their checks, one for $657 and one for $732, and their note for $2,500, bearing five per cent. interest and payable in two years. This was $111 short of the $4,000 Bartlett was to receive, but there is no contention that it did not satisfy his claim for that sum. So, pursuant to this agreement, the defendants executed a note for $2,500 on December 17, 1938, payable to Bartlett, trustee, and left it with the Coggins Title & Trust Company to be delivered to him when the escrow of December 6th between the Simpsons and the defendants had been consummated.

A one-half interest in the note was assigned to plaintiff Noble but the record is not clear as to just how his interest came about, though it discloses that after he showed the defendants the ranch and failed to sell it to them, Bartlett took charge of the negotiations and made the deal.

A few days after the execution of the Bartlett note, the defendants learned that there was pending in the superior court of Maricopa County a law suit filed some years before, No. 40828, *Arlington Canal Company* v. *James Simpson, et ux., et al.,* which involved a controversy over the water rights to the Simpson ranch. Upon learning this they had an attorney investigate the status of the water and upon his advice took the matter up with Bartlett and the Simpsons because they did not desire to pay $33,000 for land to be used principally for farming, if the water for the irrigation of it, then in litigation, should be lost. So, on December 29, 1938, they and Bartlett entered into the following agreement:

"T. E. Bartlett hereby agrees with M. B. Kubelsky and Cecil M. Colvin, that in case of loss of waters from the Gila River for Irrigating the Simpson ranch,

by virtue of any suit filed against them or the property, that said T. E. Bartlett will cancel that certain note dated Dec. 17, 1938, for $2500.00, due two years after date, and return said note to said Kubelsky and Colvin.

"Dated at Phoenix, Arizona, this 29th day of December, 1938.

> "T. E. Bartlett
> "M. B. Kubelsky
> "C. M. Colvin."

The day this agreement was executed, the defendants and the Simpsons entered into one of the same character. It provided:

" . . . that in case of the loss of the Water from the Gila River by virtue of any suit, restraining them from using the waters from the Gila River and rendering it impossible to raise crops on said land, that they reserve the right to deed back to said first parties hereto, all of the said land in said escrow set out, on the condition that parties of the first part cancel the notes and mortgage for $23,000.00, or such portions of said note and mortgage still unpaid at such time, and such first parties agree to accept said deed in full settlement for such notes and mortgage."

The day following the execution of the two agreements, the title company handed the $2,500 note, together with two checks of the defendants, totaling $1389, to Bartlett, and on January 6, 1939, turned over to the Simpsons defendants' note for $23,000, together with a mortgage on the land securing it, though the deed from the Simpsons to the defendants was not delivered until May 12, 1939.

In the summer of 1939, defendants received a letter from the attorney for the Arlington Canal Company, in case No. 40828, advising them that the court had decided that cause and while the decree had not then been entered the court announced what it would be, and it was this: the Simpson ranch was given water for sixty acres of land after 2,300 miners' inches of

the surface flow had been diverted by the Arlington Canal Company for the use of lands under that canal. Upon receiving this information, the defendants went directly to Mr. Simpson and told him they had lost their water rights and that their cotton, then about knee high, would burn up if they did not get water for it. So after talking the matter over, Mr. Simpson said "There is only one thing I can do, that is to put pumps down on the ranch as you need them." The defendants agreed to this and immediately thereafter the Simpsons installed two pumps on the ranch, about one-quarter mile from the river, at a cost of $2,800 each. Until this was done the defendants had been taking their water from the river by means of a centrifugal pump which raised it from a cemented sump in the river. This, instead of a dam, was the method used for diverting the surface flow to the ranch. When Bartlett showed the place to defendants he stated to them that he understood there was another pump further up the river, but it had not been in use for some time.

Kubelsky testified that Bartlett represented to him and Colvin, at the time, that the ranch had 1,600 miners' inches of water, constant flow from the river, but Bartlett denied this, though he admitted telling them "there was plenty of water from the Gila River for the land" that had been cultivated, about three hundred acres, and stated that by the language in the agreement of December 29th, "in case of loss of water from the Gila River," he referred to water from wells as well as from the river, though he admitted he did not suggest to them, at any time, that it would be necessary to drill wells on the land in order to have ample water.

Shortly after defendants took possession, they discovered that a building on the ranch which plaintiff

Bartlett had represented to them to be a house belonging to the property, was in fact a school house, and thereupon a credit of $500, the agreed value of the building, was allowed the defendants and endorsed on the note. The record discloses that on March 1, 1939, the defendants loaned Bartlett $150, and at the trial this was treated by the parties as a payment on the note. ·

The annual interest was not paid in December, 1939, and the plaintiffs, acting under an acceleration clause in the note, declared it due, and in February, 1940, filed suit for its face value, less the $500 credit. After hearing the matter the court, sitting without a jury, rendered judgment in favor of the plaintiffs for $2,002.61 plus $200.26 as attorneys' fees.

■■ The defendants have assigned several errors, but all of them, except one, grow out of the failure of the court to make findings of fact and state conclusions of law. At the close of the evidence defendants' attorney suggested that the court would probably like briefs and "probably want to make findings of fact and conclusion of law," whereupon the court said: "If you want that, the statute requires that you file a written request. The record may note the request for findings of fact and conclusions of law." No one has called to our attention any section of the statute providing that a request for findings must be in writing. Paragraph 21–1027, Arizona Code Annotated 1939, merely states that in actions tried before a judge without a jury "The court may, and shall at the request of either party, make written findings of fact, stating the facts found and the conclusions of law separately," and the succeeding paragraph, 21–1028, practically repeats this statement by saying that in all cases tried upon the facts without a jury, "the court, if requested, shall find the facts specially and

state separately its conclusions of law thereon." However, if a written request had been necessary, it would appear that by directing the clerk to note the request in the record, the court waived this requirement and treated the suggestion that it would "probably want to make findings" as a proper request to do so. Such being the situation, findings should have been made. However, the failure to make them does not require reversal, since the undisputed controlling facts in the case point to but one conclusion and leave no room for application of the presumption that the facts necessary to support the judgment were found.

One of the assignments is that the "judgment is not supported by the evidence and the law," and a study of the record convinces us that this contention is sound. Before the note was delivered to plaintiffs, the agreement of December 29, 1938, was executed by the parties, and as a result of this act the note and the agreement became one instrument whose provisions, so long as the note remained the property of the plaintiffs or of anyone else with notice, were governed by the law of contracts, because the owners could not then claim the rights of a holder in due course. 8 C. J. 196, § 327; 10 C. J. S., Bills and Notes, § 44. In the agreement the parties refer to "the loss of waters from the Gila River for Irrigating the Simpson ranch, by virtue of any suit filed against them or the property" and cause No. 40828, an action to determine the respective rights of the Simpson ranch and owners of land under the Arlington Canal to the use of water for irrigation from the surface flow of the river, was then pending. The conclusion in that case, which was announced in the summer of 1939, and incorporated in the final decree rendered in April, 1940, gave the Simpson ranch water from the river for the irrigation of 60 acres after the

users, served through the Arlington Canal, had had 2,300 miners' inches, and the testimony discloses that for 10 or 11 years prior to the date of the trial the river had not contained over 1180 miners' inches between May 1st and October 15th, the growing season of the year, except in case of a flush from a summer rain. Hence the result of cause No. 40828 was to deprive the Simpson ranch of irrigating water from the Gila River for farming purposes and this was the contingency upon the happening of which the agreement said ''the plaintiff will cancel'' the note and return it to the defendants. This was clearly a failure of the consideration for which the note was given. The Simpsons evidently felt this way about it because they offered at an expense of many thousands of dollars to install pumps on the ranch to supply water, and the defendants, notwithstanding it is much more expensive to pump water from wells 50 feet or thereabouts in depth than it is to raise the surface flow from the river bed by centrifugal pumps, accepted the offer, and this agreement was lived up to by both parties, the first installment of $3,833.33 on the note having been paid when due.

Plaintiffs suggest, however, that inasmuch as the court held in Cause No. 40828 that the ranch had no water until 2,300 miners' inches went elsewhere and then only enough for 60 acres, there could have been no loss of water, since one cannot lose something he has never possessed. It occurs to us that if this were true the plaintiffs, after selling the premises upon certain representations, one of which was that it had sufficient water for irrigation of the land that had been cultivated, would hardly be in a position to advance this contention.

Plaintiffs contend, however, if I understand their position, that even though the decree did de-

prive the ranch of irrigating water, the acceptance by defendants of the offer of the Simpsons to supply water by installing pumps on the ranch, had the effect of revitalizing their contract, as well as it did that of the Simpsons, and continuing it as though the contingency rendering it voidable at the option of the defendants had never occurred. This contention is, in our view, without merit. Under the agreement between the plaintiffs and the defendants, the note was discharged when cause No. 40828 resulted in the ranch's losing the river water, for that occurrence made it the duty of the plaintiffs to cancel the note and return it to the makers without any further action on their part. It could have been revitalized only by a new agreement looking to that end between the parties to it or their agents and no negotiations of that character took place. In fact Bartlett testified that his assistance relative to the installation of the pumps was not asked for and that he did not discuss it with defendants.

The contract between the Simpsons and the defendants did not provide, however, that the loss of water would automatically cancel the note and mortgage, but gave the defendants the right upon the happening of that event to deed back the premises and demand cancellation. Instead of doing this they entered into new arrangements with the Simpsons for supplying pumped water in lieu of the lost surface flow. The plaintiffs knew nothing about these negotiations until the pumps had been installed and Bartlett testified that the Simpsons did not represent him in this or any other proceeding. It is plain that the agreement relative to the pumps could not have revived or had any bearing whatever upon a contract between the plaintiffs and defendants that had already been discharged. While the two contracts arose out of the

same transaction, they were between different parties and had no relation or connection with each other. Bartlett testified that the $2,500 represented a part of the $4,000 profit he made in selling the property and was not a commission. It seems clear from the record that the surface flow of water from the river for the ranch was lost as a result of the court's action in cause No. 40828, that the effect of this was to cancel the note for $2,500 and that the installation of the pumps by the Simpsons to supply pumped water in lieu of that lost did not have the effect of giving new life to a discharged note.

The judgment is reversed and the cause remanded with directions that judgment be entered for the defendants.

LOCKWOOD, C. J., and ROSS, J., concur.